977 So.2d 405 (2008)
Nancy BYRD and Wendy Gayle (Gail) Byrd Miller, Appellants
v.
STATE of Mississippi, Appellee.
No. 2006-KA-02044-COA.
Court of Appeals of Mississippi.
March 18, 2008.
*406 Leslie S. Lee, Jackson, attorney for appellants.
Office of the Attorney General by Jeffrey A. Klingfuss, attorney for appellee.
Before LEE, P.J., CHANDLER and BARNES, JJ.
LEE, P.J., for the Court.

FACTS
¶ 1. On the morning of May 12, 2005, Ernest Byrd was working in his yard in Bailey, Mississippi. Sometime around noon, Samantha Booth and her two-year-old stepson arrived at Ernest's home to discuss the purchase of land and a trailer *407 from Ernest. While sitting in the living room discussing the transaction, Ernest saw his estranged wife, Nancy, and his daughter, Wendy Gayle Byrd Miller, driving toward his residence. Ernest met Nancy at the front door. She told him she was there to get some of her clothes. He allowed her to enter but told her if she caused any problems he would call the sheriff's department.
¶ 2. According to Ernest, Nancy entered the house and started yelling and cursing at Samantha. Wendy remained in the vehicle parked out front. Ernest called the sheriff's department. At this point, Nancy exited the house and drove away. Ernest called the sheriff's department back to tell them not to hurry because Nancy had left, but he asked that they send a deputy to escort Samantha out. Before the sheriff's department made it to the house, Nancy had returned. Samantha testified that she called the sheriff's department when she saw Nancy and Wendy arrive. Ernest testified that he was outside putting trash in his truck when he heard a horn blowing and saw Nancy and Wendy coming back down the road toward his house. According to Ernest, Nancy and Wendy exited their vehicle, walked toward the porch, and yelled curse words at Samantha. Ernest also walked back onto the porch. Ernest claimed that at this point Wendy pulled out a pocket knife and attempted to stab him. Ernest picked up a framing hammer to defend himself. Nancy picked up an axe handle, broke the glass on the storm door, and hit Ernest in the head with the axe handle. Samantha claimed that when Nancy broke the storm door Ernest told her to run and hide. She hid in the back bathroom. Ernest subdued Nancy, and Wendy broke through the locked front door and ran inside the house. According to Ernest, Wendy grabbed a gun that he kept by his chair and ran back onto the porch with the gun. Samantha testified that she heard Nancy tell Wendy to get the gun by the chair. Samantha testified that she heard Wendy telling her mother to get out of the way and then heard a gun fire. Samantha testified that when she heard the gun fire, she ran out the back door and called 911 on her cell phone. She hid under a piece of tin in the woods and stayed there until the deputies arrived.
¶ 3. Ernest testified that Nancy told Wendy to shoot him, but he held Nancy in front of him to shield himself. Wendy fired a shot but missed. Ernest testified that he ran off the porch toward the backyard. Wendy fired two more shots but missed. Ernest hid behind a tree. He claimed that Wendy gave the gun to Nancy. He was still holding the axe handle he had taken from Nancy and threw it at her. He testified that when he did this, Nancy shot him in the arm. Ernest claimed that he tried to run but fell. He testified that Nancy tried to shoot him again, but the gun failed to fire. He played dead until the women were out of sight. He crawled into the woods and hid there until law enforcement arrived.
¶ 4. When deputies arrived, Samantha emerged from the woods and told Deputy David Taylor that Nancy and Wendy had shot Ernest and that he was hiding in the woods. Deputy Taylor called for Ernest, and he came out of the woods. Deputy Taylor found the gun in the house with four spent rounds. Deputy Taylor also found the axe handle, but he did not find the knife allegedly used by Wendy. Deputy Taylor did not check the gun for fingerprints or conduct a gunpowder residue test.
¶ 5. Wendy told a different story of the events that transpired on May 12. Wendy testified that she went with her mother to Ernest's house to collect some of her mother's belongings. Ernest met them on *408 the porch and asked them to return after Samantha left, which would be in about twenty minutes. When they returned, Ernest became upset because they did not wait long enough for Samantha to leave. According to Wendy, Ernest grabbed an axe handle and a hammer and began swinging at them. Wendy became upset when Ernest hit Nancy in the leg with the axe handle. Wendy testified that Ernest broke her thumb and injured her arm with the hammer. Wendy lunged at Ernest, and they both fell down the steps. At some point, Ernest dropped the hammer. According to Wendy, she and Ernest were in the front yard, and Nancy was on the porch when Samantha came from around the house and began firing a gun. Wendy testified that Ernest was telling Samantha to shoot Wendy, but Samantha shot Ernest instead. Samantha, however, testified that she never touched the gun. Wendy also denied ever using a gun or any other weapons. Wendy stated that Samantha then ran behind the house, and Wendy broke down the front door to get inside to call 911. She testified that she then went out back to check on her mother and father, but she could not find her father. Wendy testified that she was helping her mother to the truck when deputies arrived. She testified that she was in fear of Samantha. Samantha testified in rebuttal that on May 11, the day before Ernest was shot, Wendy allegedly forced Samantha off the highway and then cursed at her and threatened her. Wendy was treated on the afternoon of the shooting for bruises and a broken thumb.

PROCEDURAL HISTORY
¶ 6. Wendy and Nancy were charged with aggravated assault. Wendy was also charged with being a felon in possession of a firearm. Nancy and Wendy were tried jointly in the Circuit Court of Kemper County. The jury found Nancy and Wendy guilty on all counts. Nancy was ordered to serve a term of fifteen years in the custody of the Mississippi Department of Corrections with twelve years suspended and five years to serve on post-release supervision. On Count I, aggravated assault, Wendy was ordered to serve a term of fifteen years with twelve years suspended and five years post-release supervision. On Count II, felon in possession of a firearm, Wendy was ordered to serve three years with two years suspended and five years post-release supervision. The sentence in Count II was ordered to run consecutively to the sentence in Count I, with the post-release supervision for both counts ordered to run concurrently.
¶ 7. Nancy and Wendy filed motions for judgment notwithstanding the verdict and a new trial. Their motions were denied by the trial court.
¶ 8. Nancy and Wendy now appeal citing the following issues: (1) the trial court erred in allowing Wendy to be cross-examined on comments made by her attorney during opening argument; (2) the trial court erred in allowing the State to comment on the defendants' rights to remain silent; and (3) the verdict was against the overwhelming weight of the evidence.
¶ 9. Finding no error, we affirm.

DISCUSSION
I. DID THE TRIAL COURT ERR IN ALLOWING WENDY TO BE CROSS-EXAMINED ON COMMENTS MADE BY HER ATTORNEY DURING OPENING ARGUMENT?
¶ 10. Nancy and Wendy argue on appeal that they were denied a fundamentally fair trial because of statements made by counsel during opening and closing arguments and on cross-examination.
*409 ¶ 11. During opening arguments, Nancy and Wendy's counsel made the following statement:
[T]he argument, the fight continued out in the yard; that Samantha Booth is inside the house. She is locked in. She is in the back of the house. And there is a gun in the house. That Wendy  neither Wendy nor Nancy Byrd went in the house. But at some point that gun comes from wherever it was in the house and it is discharged; that Ernest Byrd is struck with one of the bullets that was fired from that gun. But at no time during the events of that day of May 12, 2005, was Nancy  excuse me  was Wendy Byrd in possession of a firearm nor did she shoot her father.
On cross-examination, Wendy was asked about her counsel's statement made in opening arguments. Counsel for the State questioned Wendy as follows:
Q: Now, I try to be careful when attorneys are making comments. The way I understood the opening statement from [your attorney] was that  of course, he didn't mention anything about you and your dad basically wrestling in the yard. But he did say that shots were fired basically from an unknown person from an unknown direction. Do you remember that? Shots came from inside the house; do you remember him saying that?
A: No  I mean, yes, I remember him saying that. But that's not how it happened.
Q: Well, my question is: Did you tell [your attorney] this version of the story before today?
A: Yes.
Q: Why would he tell the jury that shots were fired from inside the house if your version of it is that the shots were from outside the house?
A: I don't know.
Q: Well, he's your lawyer, right?
A: Yes.
Q: You have no explanation as to why the opening statement version of this is that shots were fired from inside the house and yet your version of it is that shots were fired from the yard, right?
A: I believe what he said is that the gun was discharged.
Q: From inside the house, shots came from inside the house, right?
A: Maybe he was mistaken.
Q: Well, was he mistaken?
A: He was very mistaken.
Q: How can he be mistaken, ma'am? How is that possible.
DEFENSE COUNSEL: Objection. What I say is not evidence. She's offering testimony and counsel is arguing with her about decisions that I made in presenting this case.
THE COURT: Well, it is cross-examination and statements that were made by counsel that was not present, he is entitled to cross-examine this witness about where you might have obtained that information.
¶ 12. Finally, in closing argument, counsel for the State made the following comments:
What is significant about [Wendy's] attorney, in my mind, is that apparently it was unknown when we started this trial what [Wendy] was going to say. If you want my opinion, she didn't know what she was going to say until she was on the witness stand. . . .
I'm not saying it is [her attorney's] fault. I'm sure he is doing the very best he can with what he's got. But you don't say a shot came from out of the house and hit Mr. Byrd when you are about to prove or attempt to prove that Ms. Booth came around the house and *410 shot somebody. You don't do that. The problem is that nobody knew, including Ms. Miller, until she took the witness stand, what she was going to say on the witness stand. . . .
¶ 13. Nancy and Wendy argue that Wendy's testimony did not conflict with her counsel's statement in opening argument; thus, the cross-examination only served to confuse the jury and prejudice Nancy and Wendy. Wendy's testimony was that Samantha came from around the house shooting a gun. Her counsel stated that "neither Wendy nor Nancy Byrd went in the house. But at some point that gun comes from wherever it was in the house and it is discharged. . . ."
¶ 14. "[T]he standard of review that appellate courts must apply to lawyer misconduct during opening statements or closing arguments is whether the natural and probable effect of the improper argument is to create unjust prejudice against the accused so as to result in a decision influenced by the prejudice so created." Sheppard v. State, 777 So.2d 659, 661(¶ 7) (Miss.2000). Attorneys have wide latitude in closing arguments. Holly v. State, 716 So.2d 979, 988(¶ 33) (Miss.1998). Also, "any alleged improper comment must be viewed in context, taking the circumstances of the case into consideration." Haggerty v. Foster, 838 So.2d 948, 962(¶ 41) (Miss.2002). The trial judge is in the best position to determine if an alleged objectionable remark has a prejudicial effect. Alpha Gulf Coast, Inc. v. Jackson, 801 So.2d 709, 727(¶ 59) (Miss.2001) (citing Roundtree v. State, 568 So.2d 1173, 1177 (Miss.1990)).
¶ 15. While the prosecution made incorrect statements about the defense's opening statement, we cannot find that the natural and probable effect of the prosecution's statements created an unjust prejudice against Nancy or Wendy. The trial judge, who is in the best position to make such decisions, overruled the defense counsel's objections to the prosecutor's statements, and we cannot find that the trial judge erred in doing so. We find this issue to be without merit.
II. DID THE STATE INAPPROPRIATELY COMMENT ON THE DEFENDANTS' RIGHTS TO REMAIN SILENT?
¶ 16. During trial, counsel for Nancy and Wendy asked Deputy Taylor if he attempted on the day that Ernest was shot to get an account of the events that led up to the shooting from everyone at the scene. Deputy Taylor responded, "I believe I did ask what had happened, but no stories were given at the scene." On redirect, the prosecutor asked if Deputy Taylor attempted "at anytime" to get a statement from Nancy and Wendy. Deputy Taylor responded, "[y]es . . . [a]t our office, I believe it was the next day. . . . I Mirandized them and they declined to give statements at that time." This testimony was given over the objection of defense counsel. The trial court allowed questioning about whether they were asked to give a statement but not the details of the statement.
¶ 17. An accused has the right to remain silent, guaranteed by the Fifth Amendment to the United States Constitution. Evidence of post-arrest silence is improper because it violates the accused's right against self-incrimination. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Nancy and Wendy argue that Deputy Taylor's testimony that they declined to give statements penalized them for exercising their Fifth Amendment right to remain silent. They assert that this testimony constitutes reversible error.
*411 ¶ 18. In Austin v. State, 384 So.2d 600 (Miss.1980), the prosecutor commented in closing argument that the defendant had refused to give law enforcement officers a statement following his arrest. Id. at 601. The court held that evidence of post-arrest silence was improper but found the error in that case to be harmless in light of the overwhelming evidence of appellant's guilt beyond reasonable doubt and upheld the conviction. Id. Similarly, in Gray v. State, 472 So.2d 409 (Miss.1985) (overruled in part on other grounds), a witness testified in response to questioning that he knew his rights and refused to talk. Id. at 415-16. The appellant moved for a mistrial arguing that the testimony constituted a comment upon his exercise of his Fifth Amendment right to remain silent. Id. However, he did not request, nor was he given a curative instruction at that time. Id. The court determined the remark to be harmless error since there was only a single reference made of Gray's intent to remain silent, and the judge charged the jury at the conclusion of the trial that no adverse inference could be drawn from the defendant's silence. Id. Finally, in Higgins v. State, 502 So.2d 332 (Miss.1987), a police officer testified, in the presence of the jury, that in response to the Miranda warning given to the appellant, the appellant stated, "I want to talk to my lawyer." Id. at 334. In holding that the error was harmless, the court noted that: (1) the trial judge admonished the jury to disregard the officer's statement, (2) there was only a single reference by the witness to appellant's intention to remain silent, (3) testimony was thereafter presented that the appellant subsequently made statements to the police and consented to a search of his premises, and (4) the appellant testified during the course of the trial himself. Id. at 335.
¶ 19. We find that Deputy Taylor's statement regarding the defendants' rights to remain silent was harmless error. Nancy and Wendy's silence was not being used against them. Only one reference was made to appellants' intentions to remain silent. In light of the circumstances, we hold that there was no resulting prejudice to the appellants, and the error was harmless.
III. WAS THE VERDICT AGAINST THE OVERWHELMING WEIGHT OF THE EVIDENCE?
¶ 20. Nancy and Wendy argue that the verdict was against the overwhelming weight of the evidence. Our standard of review concerning the overwhelming weight of the evidence is well settled: "[W]e will only disturb a verdict when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." Bush v. State, 895 So.2d 836, 844(¶ 18) (Miss.2005). The appellate court sits as a hypothetical "thirteenth juror." Id. Therefore, the Court weighs the evidence "in the light most favorable to the verdict." Id. If, in this position, the Court disagrees with the verdict of the jury, the proper remedy is to grant a new trial. Id.
¶ 21. In support of their argument, Nancy and Wendy alleged that a new trial is warranted because the knife allegedly used by Wendy was never found, telephone records were not produced to show that Samantha called 911 from her cell phone, no gunshot residue or fingerprint tests were done, and defense counsel was not given the opportunity to develop testimony regarding Samantha's relationship with Ernest. Also, Nancy and Wendy point to inconsistencies between Ernest's testimony and the written statement he provided to deputies several days after the incident. In this section of their brief, they also alleged that various questions and comments by the prosecution were *412 improper. Specifically, they argued that the prosecution spent more time attacking Wendy's credibility on extraneous matters than presenting the facts of the case.
¶ 22. Weighing the evidence in the light most favorable to the verdict, we cannot find that the verdict of the jury was against the overwhelming weight of the evidence. When presented with conflicting evidence, it is the role of the jury to weigh the witnesses' testimony. Triplett v. State, 840 So.2d 727, 731(¶ 9) (Miss. Ct.App.2002). As for the argument that the prosecution unnecessarily attacked Wendy's credibility, Wendy had a prior felony conviction for obtaining a controlled substance by fraud. Since Wendy's prior felony conviction involved lying or deceit, impeachment based on Mississippi Rule of Evidence 609 was proper. We cannot find that the State "unnecessarily steered the jury away from the facts" during its questioning of Wendy about her prior felonies.
¶ 23. We find this issue to be without merit.
¶ 24. THE JUDGMENT OF THE KEMPER COUNTY CIRCUIT COURT OF CONVICTION OF NANCY BYRD OF AGGRAVATED ASSAULT AND SENTENCE OF FIFTEEN YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS WITH TWELVE YEARS SUSPENDED AND FIVE YEARS OF POST-RELEASE SUPERVISION AND PAY $750 RESTITUTION TO THE VICTIM'S COMPENSATION FUND, IS AFFIRMED.
¶ 25. THE JUDGMENT OF THE KEMPER COUNTY CIRCUIT COURT OF CONVICTION OF WENDY MILLER AS TO COUNT I, AGGRAVATED ASSAULT, AND SENTENCE OF FIFTEEN YEARS WITH TWELVE YEARS SUSPENDED AND FIVE YEARS OF POST-RELEASE SUPERVISION AND PAY $750 RESTITUTION TO THE VICTIM'S COMPENSATION FUND AND COUNT II, FELON IN POSSESSION OF A FIREARM, AND SENTENCE OF THREE YEARS WITH TWO YEARS SUSPENDED AND FIVE YEARS OF POST-RELEASE SUPERVISION, ALL IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, WITH THE SENTENCE IN COUNT II TO RUN CONSECUTIVELY TO COUNT I AND THE POST-RELEASE SUPERVISION FOR BOTH COUNTS TO RUN CONCURRENTLY, IS AFFIRMED.
¶ 26. ALL COSTS OF THIS APPEAL ARE ASSESSED TO KEMPER COUNTY.
KING, C.J., MYERS, P.J., CHANDLER, GRIFFIS, BARNES, ISHEE AND CARLTON, JJ., CONCUR. IRVING, J., CONCURS IN RESULT ONLY. ROBERTS, J., NOT PARTICIPATING.